Jeff S. Westerman (State Bar No. 94559)
**WESTERMAN LAW CORP.**
1875 Century Park East, Suite 2200
Los Angeles, CA, 90067
(310) 698-7880
jwesterman@jswlegal.com

Steven J. Toll (*pro hac vice* forthcoming)
Times Wang (State Bar No. 281077)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
(202) 408-4600
stoll@cohenmilstein.com
twang@cohenmilstein.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| Alan Gordon and Marlene Gordon, on behalf of themselves and those similarly situated<br><br>Plaintiffs,<br><br>vs.<br><br>Comerica Bank, and Does 1-10<br><br>Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>• **AIDING AND ABETTING FRAUD;**<br><br>• **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;**<br><br>• **NEGLIGENCE; and**<br><br>• **VIOLATION OF CAL. BUS. & PROF. CODE § 17200** *et seq*.<br><br>**DEMAND FOR JURY TRIAL** |

1

1    Plaintiffs Alan Gordon, Marlene Gordon, and Richard Goldberg, on behalf of
2    themselves and all others similarly situated, allege as follows against Defendant
3    Comerica Bank ("Defendant" or "Comerica"), based on personal knowledge as to
4    themselves and their own acts, and otherwise based on the investigations conducted
5    by and through their counsel, including review of Defendant's public statements, U.S.
6    Securities and Exchange Commission ("SEC") filings, interviews, media reports, and
7    social media information, as well as other commentary, analysis, and information.

8    **I.    SUMMARY OF THE ACTION**

9        1.    Plaintiffs purchased investments from the Woodbridge group of
10   companies. These companies' owner and operator, Robert H. Shapiro, individually and
11   through his controlled affiliates, marketed promissory notes and other offerings as low-
12   risk, high-yield investments backed by high-interest real-estate loans to third-party
13   commercial borrowers. But Woodbridge had few real counterparties. Nearly all of the
14   allegedly supporting loans were to Shapiro's own shell companies. Lacking the revenue
15   to pay returns owed to Plaintiffs and other investors, Shapiro paid the returns using new
16   investor money, raising more than $1.22 billion before the Ponzi scheme collapsed. In
17   December 2017, most of the Woodbridge companies declared Chapter 11 bankruptcy.
18   The investors now face enormous losses. The SEC, while not seeking restitution for
19   investors, named Shapiro and his Woodbridge entities as defendants in a recent
20   complaint.

21       2.    Comerica had notice of Shapiro's fraud from a series of red flags
22   associated with the accounts from which Shapiro misappropriated over $21 million in
23   investor funds. Each Woodbridge bank account was opened and maintained at
24   Comerica, and Comerica continued to enable Shapiro's fraud even after several state
25   regulatory agencies ordered him to cease and desist operations. Woodbridge lacked
26   internal controls and engaged in many atypical banking activities. Drawing on
27   Woodbridge's Comerica accounts, Shapiro spent millions of dollars on private planes,
28   fancy cars, jewelry, and other luxury goods. Shapiro's wife, and her company, also

1    received substantial investor proceeds from Woodbridge's accounts at Comerica.

2    Although Woodbridge was ostensibly a billion-dollar enterprise, Shapiro remained the

3    sole signatory on all of its accounts and insisted on hand-signing every check to

4    investors and sales agents. Woodbridge and Shapiro used $368 million in new investor

5    funds to pay existing investors out of Comerica accounts. Shapiro pooled investment

6    funds from holders of promissory notes and of his other fraudulent offerings in fund

7    entity accounts, further commingling those funds into a single Woodbridge operating

8    account under his control. The commingling involved transfers of around $1.66 billion

9    and nearly 11,000 Comerica accounts.

10       3.    Shapiro's banking activities at Comerica were integral to his scheme to

11   defraud investors. Comerica substantially assisted, and had knowledge of, the

12   Woodbridge investor fraud. Comerica therefore is liable to Plaintiffs and the other

13   defrauded investors for their losses.

14   **II.    PARTIES AND RELEVANT NON-PARTIES**

15       **A.    Plaintiffs**

16       4.    Plaintiffs Alan Gordon and Marlene Gordon are citizens of Florida, reside

17   in Sunrise, Florida, and invested $100,000 in FPCM Woodbridge promissory notes.

18       **B.    Defendants**

19       5.    Defendant Comerica Bank is a Texas banking association with its principal

20   place of business in Dallas, Texas.

21       6.    Comerica Bank is chartered by the State of Texas and subject to

22   supervision 5 and regulation by the Texas Department of Banking under the Texas

23   Finance Code. Comerica Bank is also a member of the Federal Reserve System under

24   the Federal Reserve Act and thus subject to federal regulations.

25       7.    All Woodbridge bank accounts were maintained at Comerica.

26       8.    Comerica Bank is a subsidiary of Comerica Incorporated, which is

27   incorporated under Delaware law and headquartered in Dallas, Texas. According to

28   Comerica Incorporated's Form 10-K filed with the SEC for 2016, "[b]ased on total

1  assets . . . it was among the 25 largest commercial United States financial holding

2  companies."

3      9.    As Comerica Incorporated acknowledged in its 2016 Form 10-K, it and its

4  subsidiaries are subject to United States anti-money laundering laws and regulations.

5  Comerica represents on its website that it "and all of its subsidiaries, including

6  Comerica Bank, comply with the Bank Secrecy Act (BSA) and USA PATRIOT Act

7  requirements."[1]

8      10.   Does 1-10 participated in the alleged wrongdoing and their identities and

9  roles are not yet known.

10      **C.    Relevant Non-Parties**

11      11.   Robert H. Shapiro is a citizen of Sherman Oaks, California, and also

12  maintains a residence in Aspen, Colorado. Before December 2017 Shapiro served as

13  Woodbridge's CEO, trustee of the RS Protection Trust, and sole operator of most of the

14  entities comprising the Woodbridge Group Enterprise. At all relevant times, Shapiro

15  maintained complete control over the Woodbridge entities and was the sole signatory

16  on Woodbridge's bank accounts at Comerica.

17      12.   The Woodbridge Group Enterprise operates through a network of affiliated

18  Comerica Bank, Anti-Money Laundering Compliance, available at companies that own

19  the various assets comprising its business. All of these companies are directly or

20  indirectly owned by RS Protection Trust.

21      13.   Woodbridge Group of Companies, LLC is a financial company based in

22  Sherman Oaks that was formed in 2014. It served as the main company through which

23  Shapiro operated the Woodbridge Group Enterprise during the relevant time period. It

24  consisted of approximately 140 employees across six states.

25      14.   RS Protection Trust is an irrevocable trust settled under Nevada law and

26

27      _____

28      [1] Comerica Bank, Anti-Money Laundering Compliance, *available at*
http://investor.comerica.com/phoenix.zhtml?c=114699&p=irol-govmoney.

controlled by Shapiro. He serves as the trustee, and members of his family are the sole beneficiaries of the trust. RS Protection Trust holds all of Shapiro's business entities and personal assets, including Woodbridge Group Enterprise companies.

15.     WMF Management, LLC is a California LLC controlled by Shapiro. WMF is a holding company for many of the companies comprising the Woodbridge Group Enterprise, all of which Shapiro controlled and operated, and which include Woodbridge Group of Companies, LLC, Woodbridge Mortgage Investment Fund 1, LLC, Woodbridge Mortgage Investment Fund 2, LLC, Woodbridge Mortgage Investment Fund 3, LLC, Woodbridge Mortgage Investment Fund 3A, LLC, Woodbridge Mortgage Investment Fund 4, LLC, Woodbridge Commercial Bridge Loan Fund 1, LLC, and Woodbridge Commercial Bridge Loan Fund 2, LLC.

16.     The Relevant Non-Parties set forth above are not named as defendants in this action. This complaint does not seek to assert any claim or obtain any relief that falls within the exclusive jurisdiction of the pending bankruptcy proceeding or SEC enforcement action. This complaint does not involve any claim subject to the automatic stay of bankruptcy-related claims under 11 U.S.C. § 362(a).

## III.    JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because Plaintiffs and Comerica are citizens of different states, the total amount in controversy exceeds $5 million, excluding interest and costs, and the class contains more than 100 members.

18.     This Court has subject matter jurisdiction over Plaintiffs' individual claims under 28 U.S.C. § 1332(b) based on diversity of citizenship. The amounts in controversy for Plaintiffs' individual claims exceed $75,000, exclusive of interest and costs.

19.     The Court has personal jurisdiction over Comerica because it aided and abetted Shapiro's Ponzi scheme and misappropriation of investor funds in California. Shapiro is a resident of Sherman Oaks, California, where Woodbridge is based and has employees. A substantial portion of the residential and commercial properties

Woodbridge purchased using investor funds are in Los Angeles, and many of the Comerica bank accounts used to carry out the fraud were opened or experienced account activity originating in the Los Angeles area, including at Comerica's Studio City branch.

20.     Venue is proper in this District under 28 U.S.C. § 1391 because Comerica is subject to personal jurisdiction in this District for the claims alleged and a substantial part of the events and omissions giving rise to these claims occurred in this District.

## IV.     OVERVIEW OF RELEVANT BANKING REGULATIONS

21.     Federal law requires banks to know their customers and understand their customers' banking behavior. Under applicable regulations, a bank must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. §§ 1020.220(a)(1), (2). Thus, banks are required to collect information about the holder of each account. Where an entity opens an account, the bank must obtain information concerning the individuals who control the account.

22.     The Financial Industry Regulatory Authority (FINRA) likewise imposes know-your-customer requirements and mandates "reasonable diligence, in regard to the opening and maintenance of every account," including the obligation "to know (and retain) the essential facts concerning every customer and concerning the authority of 26each person acting on behalf of such customer."

23.     Comerica is obligated to comply with the Bank Secrecy Act (BSA), 12 C.F.R. § 21.21, including regulations broadening its anti-money laundering provisions.

24.     The BSA requires Comerica to develop, administer, and maintain a program to ensure compliance. The program must be approved by the bank's board of directors and noted in the board meeting minutes. It must: (1) provide for a system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance,6and (4) provide training for appropriate personnel.

25.     Comerica also must develop a customer due diligence program to assist in

CLASS ACTION COMPLAINT

predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means for identifying unusual or suspicious transactions for each customer. The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

26.    Customer due diligence programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk, banks should gather additional information about the customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

27.    Additionally, Comerica must designate a BSA compliance officer who is a senior bank official responsible for coordinating and monitoring compliance with the BSA. The compliance officer must, in turn, designate an individual at each office or branch to monitor the bank's day-to-day BSA compliance.

28.    The federal government established the Federal Financial Institutions Council (FFIEC) in 1979 to prescribe uniform principles, standards, and report forms and to promote uniformity in the supervision of financial institutions. The FFIEC's Bank Secrecy Anti-Money Laundering Manual summarizes BSA and anti-money laundering compliance program requirements, risks and risk management expectations, industry sound practices, and examination procedures. The FFIEC manual is based on BSA laws and regulations and BSA and anti-money laundering directives issued by federal banking agencies, such as the Federal Reserve, the Federal Deposit Insurance Corporation (FDIC), and the Office of the Comptroller of Currency. *See* FFIEC 5BSA/AML Examination Manual, at p. 5 (2010)

29.    Banks must also ensure that their employees follow BSA guidelines. Banks make compliance a condition of employment and incorporate compliance with the BSA

and its implementing regulations into job descriptions and performance evaluations. Banks are therefore required to train all personnel whose duties may require knowledge of the BSA on that statute's requirements.

30.     Banks and their personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering "red flags" set forth in the FFIEC BSA/AML Examination Manual. These red flags include: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the account holder's business; (4) transfers of funds among related accounts; (5) depositing of funds into several accounts that are later consolidated into a single master account; (6) large fund transfers sent in round dollar amounts; (7) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; (8) multiple high-value payments or transfers between shell companies without a legitimate business purpose; (9) payments unconnected to legitimate contracts or revenue sources; (10) fund transfers containing limited content or related party information; (11) transacting businesses sharing the same address; and (12) an unusually large number of persons or entities receiving fund transfers from one company.

31.     The FFIEC Manual identifies "lending activities" and "nondeposit account services"—including nondeposit investment products—as services requiring enhanced due diligence and carrying a high risk of money laundering because they facilitate a higher degree of anonymity and involve high volumes of currency. Thus, the FFIEC Manual requires heightened due diligence on the part of banks when such services occur, including determining the purpose of the account, ascertaining the source and funds of wealth, identifying account control persons and signatories, scrutinizing the account holders' business operations, and obtaining explanations for account activity.

## V.     FACTUAL ALLEGATIONS

### A.     The Woodbridge Investment Scheme

7

32. Woodbridge raised more than $1.22 billion from over 8,400 investors nationwide. At least 2,600 of these investors used their individual retirement account funds to invest nearly $400 million.

33. Beginning in July 2012 through at least December 4, 2017, Shapiro orchestrated a Ponzi scheme using Woodbridge entities. Woodbridge was the principal operating company of Shapiro's businesses and employed approximately 140 people in 13 offices in six states. Shapiro was the sole owner, and maintained exclusive operational control over, Woodbridge and each of its entities.

34. Woodbridge raised money by borrowing funds in connection with promissory notes that investors purchased, and through private placement subscription arrangements under which investors purchased units in Woodbridge funds. The promissory notes, referred to in this complaint as FPCMs or FPCM notes—short for First Position Commercial Mortgages—typically had a term of 12-18 months and were marketed as paying a 5%-8% annual return on a monthly basis. Woodbridge's subscription offerings—the "Fund Offerings"—typically had a five-year term, and were marketed as paying a 6%-10% annual return on a monthly basis and, at the end of five years, a 2% accrued dividend and share of the profits. Neither type of investment was ever registered with the SEC or another government agency.

35. Shapiro's scheme was made possible by Woodbridge's accounts at Comerica as well as an extensive sales operation. Woodbridge employed a sales team of approximately 30 in-house employees. Woodbridge also relied on a network of hundreds of external sales agents to solicit investments from the public through television, radio, and newspaper advertising, cold calling, social media, websites, seminars, and in-person presentations. Virtually none of these sales agents were registered with any regulatory agency.

36. The purported revenue source enabling Woodbridge to pay returns to investors was the interest a Woodbridge affiliate would be receiving on loans to third-party owners of commercial real estate. Woodbridge represented to investors that its

affiliate would pool money from many investors and lend it to a third-party borrower for a short term, and for only about two-thirds of the value of the real estate securing the transaction, thereby ensuring that the "properties that secure the mortgages are worth considerably more than the loans themselves at closing." According to a Woodbridge FAQ document, "[y]our loan is secured by a hard asset collateral—the property itself." Woodbridge further represented to investors that it conducted all due diligence, including title search and appraisal, on the commercial property and borrower. Woodbridge also represented that after one year, the third-party borrower would be obligated to repay Woodbridge the principal amount of the loan and that upon default Woodbridge could foreclose on the property to recover the full amount owed.

37.    Woodbridge told investors that the third-party borrowers were paying it 11-15% in annual interest for "hard money" loans. The borrowers, Woodbridge told investors, were bona fide commercial property owners who could not obtain traditional loans and were willing to pay higher interest rates for short-term financing. Woodbridge told FPCM investors that their returns would be derived from those interest payments, falsely promising the investors a pro rata first-position "lien" interest in the underlying properties: "If you have a first position, that means you have priority over any other liens or claims on a property if the property owner defaults." In the offering memoranda for the Fund Offerings, Woodbridge represented to investors that their funds would be used for real estate acquisitions and investments, including in Woodbridge's FPCMs. But in fact, Woodbridge directly applied the incoming funds to pay other investors' returns.

38.    Woodbridge also told investors that it had another revenue source from "flipping" properties, *i.e.*, buying them to develop and then sell for a profit.

39.    Woodbridge's marketing materials contained the following graphic regarding the FPCMs:

**Now is the time to forego old-fashioned wealth-building solutions.**

Woodbridge Wealth wants to help you diversify your portfolio by participating in the real estate revolution. What does that look like?



Let us help you protect your retirement funds from market volatility. We succeed when you succeed. It's that simple.

40.     Woodbridge's marketing materials also state that it "receives the mortgage payments directly from the borrower, and Woodbridge in turn delivers the loan payments to you under your first position documents." That statement was false. Contrary to Woodbridge's representations, almost all of the purported third-party borrowers—the "owner" and "property owner" in parts 2 and 3 of the above marketing graphic—were hundreds of *Shapiro*-owned and -controlled LLCs with no bank account or source of income, and which never made any loan payments to Woodbridge. Shapiro and his sales team concealed these facts from investors while knowing the Woodbridge scheme was unsustainable.

41.     In June 2017, Woodbridge employees engaged in email correspondence regarding a lack of inventory to support investor loans. Woodbridge employee Diana

10

Balayan wrote, "Yikes...that's really bad Dayne. I mean there's no coming back from there." Woodbridge managing director Dayne Roseman replied, "I'm sorry guys. I'm at a loss. I need inventory, now." Responding to Roseman's question as to whether an already encumbered property could be refinanced, Woodbridge employee Lianna Iranossian wrote, "I can't Dayne I just can't you are asking the impossible." Roseman replied, "I'm open to suggestions," to which Iranossian responded, "I suggest you kill me lol." Balayan then responded, "Me second."

42.    Shapiro supported Woodbridge's business almost entirely by raising new investor funds and using them to pay returns to existing investors. Woodbridge raised at least $1.22 billion from FPCM and Fund Offering investors but issued only around $675 million in "loans" for real estate purportedly securing the investments. Instead of generating the promised 11-15% interest, the loans generated only $13.7 million from third-party borrowers—far less than required to operate Woodbridge's business and pay returns. Notwithstanding this shortfall, Woodbridge paid investors more than $368 million in interest, dividends, and principal repayments. Woodbridge spent another $172 million on operating expenses, including $64.5 million for sales commissions and $44 million for payroll, and $21.2 million to finance Shapiro's lavish lifestyle.

43.    To maintain these Woodbridge operations, Shapiro needed a continuous infusion of new investor funds as well as for existing FPCM investors to roll over their investments at the end of their terms (ideally into longer-term Fund Offerings) so that Woodbridge could avoid repaying the principal.

44.    To generate the large volume of investor funds needed to sustain the Woodbridge operations, Woodbridge aggressively promoted the FPCM notes by offering incentives, such as cash bonuses, to brokers who recommended these investments to their clients. Woodbridge also established a program called "Pass It On" through which brokers were encouraged to inform their colleagues about the FPCM notes. Under that program, a referring broker would earn 25 basis points on each FPCM sale closed by a broker whom he or she referred.

45.    When fundraising eventually slowed, tension emerged between Shapiro and his high-level employees. In May 2016, Shapiro emailed Roseman: "i think you have a bunch of overpaid lazy people up there and I am going to start thining [sic] out the ranks and making people work for a living." Roseman responded that terminating employees would "solve nothing" because the company's main brokers were experiencing the same slowdown in raising additional investor funds.

46.    On December 1, 2017, still owing more than $961 million in principal to investors, Woodbridge missed its first interest payments to investors. On December 4, 2017, Shapiro caused most of his companies to declare Chapter 11 bankruptcy.

**B.    The Fraud Emerges**

47.    Since 2015, Shapiro and Woodbridge have come under increasing scrutiny and censure by both state and federal regulatory authorities

**(1)    State Proceedings**

48.    Woodbridge and its affiliated entities have been the subject of 25 information requests from state regulators. Five regulators—in Texas, Massachusetts, Arizona, Pennsylvania, and Michigan—have issued cease-and-desist or consent orders based on Woodbridge's securities fraud and sales of unregistered securities. There are pending proceedings against Woodbridge entities in Arizona, Colorado, Idaho, and Michigan.

49.    The terms of these consent decrees and cease-and-desist orders demonstrated that Woodbridge was operating an illegal investment scheme. Public filings in Massachusetts, Texas, Arizona, Pennsylvania, and Michigan exposed Woodbridge's unorthodox and unlawful business practices.

50.    The state regulatory agencies that issued the cease-and-desist and consent orders made them available to the public through their respective websites. Minimal monitoring efforts by Comerica would have turned up numerous, serious regulatory actions against Woodbridge, which should have prompted Comerica to conduct reasonable due diligence in response.

### a)    Massachusetts

51.    On May 4, 2015, the Massachusetts Securities Division entered into a consent order with Woodbridge Mortgage Investment Fund 1, LLC, Woodbridge Mortgage Investment Fund 2, LLC, and Woodbridge Mortgage Investment Fund 3, LLC.

52.    Massachusetts charged that (1) Woodbridge failed to register the FPCM notes as securities as required by law; (2) Woodbridge did not maintain separate financial accounts for each Massachusetts investor, or a separate fund or pool, for payment of the obligations to each Massachusetts investor, instead paying investors from general corporate accounts; (3) investors relied on Woodbridge to properly value the property serving as collateral on the loan, including its potential for depreciation, to file the Massachusetts investor's security interest on local land records, and to obtain title insurance on the property; (4) and "[i]n cases where the property does not adequately collateralize the loan made by Woodbridge, Massachusetts Investors will have to rely on Woodbridge to maintain liquid cash reserves to continue making interest and principal payments despite possible loss in the value of collateral."

53.    By operation of the Massachusetts consent order, Woodbridge was to cease and desist selling unregistered securities in the state, was censured by the Massachusetts Securities Division, rescinded the FPCM agreements with Massachusetts investors and returned their principal investments, and agreed to pay the Commonwealth of Massachusetts a $250,000 civil penalty.

### b)    Texas

54.    On July 17, 2015, the Texas State Securities Board issued an emergency cease-and-desist order against Shapiro and Woodbridge Mortgage Investment Fund 3, LLC, among other entities.

55.    Texas entered the following findings of fact: (1) Shapiro controlled Woodbridge; (2) the FPCM notes were not registered for sale as securities in Texas; (3) the brokers selling the FPCM notes in Texas were not registered; (4) Woodbridge and

Shapiro did not take reasonable steps to verify that all of its purchasers were accredited investors; (5) Woodbridge and Shapiro failed to disclose Woodbridge's assets, liabilities, and other financial data relevant to Woodbridge's ability to pay investor returns and ultimately principal; (6) Woodbridge failed to disclose how investor funds would be held while Woodbridge attempted to raise sufficient money to fund the commercial loans; (7) Woodbridge failed to disclose the risks associated with the FPCM notes; and (8) Woodbridge failed to disclose that it had entered into a consent order with the Massachusetts Securities Division.

56.     Texas concluded that Woodbridge and Shapiro violated state law by offering unregistered securities for sale and committing fraud in connection with the offer for sale of securities. The Texas State Securities Board accordingly ordered Woodbridge and Shapiro to stop selling the FPCM notes in Texas and to stop committing fraud in connection with the sale of the FPCM notes in Texas.

57.     Shortly after its issuance, the Texas cease-and-desist order was reported in the legal press.[2]

### c)    Arizona

58.     On October 4, 2016, the Securities Division of the Arizona Corporation Commission instituted cease-and-desist proceedings against Shapiro and several Woodbridge affiliates.

59.     Arizona charged that: (1) Shapiro controlled the Woodbridge funds; (2) if the real estate did not adequately capitalize the loans, the Woodbridge funds might not have enough liquid cash reserve to continue making investor payments; (3) investor security interests might be invalidated by the Woodbridge funds' failure to perfect the security interests; (4) the Woodbridge funds sold the FPCM notes through unregistered

---

[2] Jess Krochtengel, *Texas Regulator Calls Out 3 Businesses For Securities Fraud*, Law360 (July 22, 2015), https://www.law360.com/articles/682361?utm_source=rss&utm_medium=rss&utm_campaign=articles_search.

sales agents; (5) Woodbridge falsely told investors that "Woodbridge and its predecessors have never been found to have violated any securities law"; (6) Woodbridge sold unregistered securities in the state of Arizona, using unregistered sales agents, both in violation of Arizona law; and (7) Woodbridge committed securities fraud by failing to disclose the Massachusetts and Texas consent decrees.

### d)    Pennsylvania

60.    On April 24, 2017, the Commonwealth of Pennsylvania Department of Banking and Securities issued an order concluding that Woodbridge violated the Pennsylvania Securities Act of 1972 by offering securities through unregistered sales agents.

61.    Instead of defending itself in litigation, Woodbridge entered into a consent decree with Pennsylvania regulators under which it was required to pay a $30,000 fine.

### e)    Michigan

62.    On August 8, 2017, Michigan's Department of Licensing and Regulatory Affairs issued a cease-and-desist order prohibiting Woodbridge from offering or selling unregistered securities in the state or omitting material facts in connection with the sale of securities.

63.    Following its investigation, Michigan found: (1) the FPCM notes were unregistered securities; and (2) Woodbridge described the FPCM notes as safe and low-risk, but did not provide financial information to demonstrate its ability to pay promised returns or disclose to investors that it was the subject of several cease-and-desist orders.

64.    Michigan ordered Woodbridge to cease and desist selling unregistered securities in the state, and imposed a civil fine of $500,000.

### (2)    Federal Proceedings

65.    The SEC has been investigating Shapiro and Woodbridge since at least September 2016. The SEC's investigation has focused on Woodbridge's unregistered sale of securities and whether it "is operating a fraud on its investors."

### a)    The SEC's Subpoena Enforcement Actions

66.   Woodbridge has refused to cooperate with the SEC investigation. The SEC consequently brought two separate enforcement actions, one of which resulted in a motion for civil contempt.

67.   Shapiro and his high-level employees—managing director Roseman and controller Pedersen—refused to answer any questions at their SEC depositions, instead invoking their rights against self-incrimination under the Fifth Amendment.

68.   Woodbridge's intransigence did not prevent the SEC from discovering its fraud. In one of the subpoena enforcement proceedings, the SEC stated, "Woodbridge has represented to investors that bona-fide third parties are borrowing money and repaying interest at a high rate, of which the investors in Woodbridge funds get a portion thereof. However, evidence obtained in our investigation reveals that many, if not all, of these LLCs may be Woodbridge affiliates with Shapiro as their Manager."

### b)   Woodbridge's Bankruptcy

69.   On December 4, 2017, Woodbridge declared bankruptcy under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532. Woodbridge has attempted to use this voluntary bankruptcy proceeding to procure a stay of the SEC subpoena enforcement actions.

70.   Woodbridge alleged in the bankruptcy action that it is now transitioning to an institutional fundraising model, and that it has removed Shapiro from control over the entities and replaced him with an independent manager. Nonetheless, Woodbridge agreed to retain Shapiro as a consultant, pay him $175,000 per month, allow him to continue to use multi-million dollar Woodbridge-owned properties in Los Angeles and Aspen at below-market rents, and give him the authority to remove the supposedly independent manager.

71.   Moreover, in the bankruptcy action, Woodbridge for the first time asserted the position that the FPCM noteholders, who comprise the vast majority of the creditors, with $750 million of debt outstanding, are in fact unsecured and should lose their entire investment. A footnote in the declaration of the newly appointed independent manager

states:

> It appears that few, if any, Noteholders have taken proper steps to perfect their interest in the Notes pursuant to either of sections 9-312(a) or 9-313(a) of the Uniform Commercial Code ("UCC"), which provide that a security interest in promissory notes (such as the collateral securing the Notes) must be perfected by taking possession of the underlying notes or by the filing of a UCC-1 financing statement describing the underlying notes, respectively. The Debtors have confirmed that no Noteholder is in possession of any of the collateral securing the Notes. Further, on information and belief and based on an investigation, no Noteholder has filed a UCC-1 financing statement with respect to any of the collateral securing the Notes in Delaware, the jurisdiction of the Funds. It therefore appears that any security interests held by the Noteholders is avoidable, such that the Noteholders' claims will ultimately be treated as unsecured claims in these Chapter 11 Cases. The Debtors intend to commence adversary proceedings seeking the avoidance of these security interests.[3]

72.     Woodbridge's position in the foregoing respect contradicts its promises to the FPCM noteholders in its offering and promotional materials. Those materials make no mention of any need on the part of investors to "perfect" their security interests, but state unequivocally:

- "Secured by commercial real estate";

- "Recorded first lien position";

- "Woodbridge hereby grants to the Lender a security interest in all of the Woodbridge's [sic] present and future right, title and interest in and to any and all of [the collateral]";

- "This note will be secured <u>inter alia</u> by the Collateral Assignment Documents upon execution thereof."

### c)     The SEC's Civil Enforcement Action

73.     On December 20, 2017, the SEC filed a civil complaint for injunctive and

---

[3] Declaration of Lawrence R. Perkins, *In re Woodbridge Group of Companies, LLC* (Bankr. D. Del. Dec. 4, 2017), ECF No. 12 at 8 n.9.

other relief charging that Shapiro ran a "massive Ponzi scheme," commingled investor funds, paid existing investors with money garnered from new investors, and misappropriated millions of dollars to "live[] in the lap of luxury . . . spen[ding] exorbitant amounts of investor money in alarming fashion, on items such as luxury automobiles, jewelry, country club memberships, fine wine, and chartering private planes."[4]

74.    According to the SEC, "Woodbridge's business model was a sham"— instead of paying investor returns with interest obtained from legitimate third-party mortgages, Woodbridge and Shapiro aggressively raised funds from new investors and used those incoming funds to pay old investor returns.

75.    The court acted immediately on the SEC's emergency *ex parte* motion for a temporary asset freeze and a sworn accounting of all Woodbridge accounts, granting the motion on December 20, 2017, setting a hearing for December 29, 2017, and "find[ing] good cause to believe that unless immediately restrained and enjoined . . . Defendants Shapiro, RS Trust, Non-Filer Shapiro Property LLCs and Non-Filer Shapiro Holding LLCs, will continue to dissipate, conceal or transfer . . . assets that are likely subject to an Order of disgorgement."

76.    The SEC does not seek restitution for the investors who face a substantial risk of losing their investments.

**C.    Comerica Abetted and Participated in the Woodbridge Fraud**

77.    Shapiro's banking activities at Comerica were integral to his scheme to bilk 9investors in California and across the country. It was through Comerica account transactions that Shapiro applied new investor funds to pay existing investor returns, disbursed investor funds to his wife and her company, and spent millions in investor funds for his own personal enjoyment.

78.    Shapiro could not have carried out his scheme without first raising a

---

[4] *SEC v. Shapiro*, No. 1:17-cv-24624-MGC (S.D. Fla. Dec. 20, 2017).

tremendous amount of investor funds, and then depositing and transferring those funds among bank accounts to conceal that Woodbridge was raising more money than the underlying properties and pledged collateral could support. Shapiro's use of Comerica accounts to shuffle money through a tangle of affiliated entities enabled him to use new money to pay older investors, in classic Ponzi fashion, instead of funding payments with interest earned from bona fide third-party mortgages.

79.     Shapiro could not have carried out his scheme without either (A) using a complex array of accounts at different banks, so that no single bank would be able to detect the ongoing fraud; or (B) getting a single bank—here, Comerica—to turn a blind eye to his unorthodox asset transfers, sales of unregistered securities (through unlicensed brokers), commingling of investor funds, and other highly irregular banking activities.

80.     Under applicable banking regulations (*see supra* ¶¶ 22-28), Comerica was required to "know its customers"—Shapiro and Woodbridge—and maintain a customer due diligence program to predict the types and volume of transactions Shapiro and Woodbridge were likely to conduct so Comerica could identify any suspicious activity. Yet Comerica continued to provide Shapiro with the banking support and account platforms needed to carry out his scheme to defraud even after state and federal proceedings brought Woodbridge's violations to light.

81.     Unsophisticated Woodbridge investors increasingly learned of the state regulators' actions against Woodbridge through internet searches. The cease-and-desist and consent orders against Woodbridge were well publicized and caused many Woodbridge investors to demand refunds, placing further pressure on Woodbridge's business. Its misconduct was all the more visible to the bank that maintained the accounts being used to carry out the fraud.

82.     Even before the state and federal regulatory proceedings commenced, Shapiro's Comerica banking activities provided several indicia of his misconduct. Many of Shapiro's atypical banking activities constituted FFIEC red flags—visible to

CLASS ACTION COMPLAINT

Comerica but not to individual investors. *See supra* ¶¶ 31-32.

83.    By way of example, Shapiro pooled investor funds in fund entity accounts and commingled them further into a single Woodbridge operating account under his control. His commingling of assets involved around $1.66 billion in transfers and nearly 11,000 Comerica account transactions. The unusual nature and high volume of this account activity gave the bank notice of the illegitimacy of this real-estate investment business, and should have caused Comerica to take responsive measures.

84.    Shapiro applied $368 million in new investor funds to pay existing investors out of Comerica accounts.

85.    Shapiro also applied investor funds in Comerica accounts to purchase almost 200 properties in the Los Angeles and Aspen areas for around $675 million. The net returns from those properties have been nominal, with many remaining undeveloped, vacant lots. On January 26, 2017, Shapiro emailed Woodbridge managing director Dayne Roseman that "the numbers this month look awful due to lack of inventory," suggesting that Woodbridge "take money in with property pending." Roseman agreed to do so. Comerica ignored Woodbridge's "awful" financial numbers and the fact that its intake of investor funds was not matched by corresponding real-estate development or ending to genuine counterparties.

86.    Although Woodbridge raised at least $1.22 billion from investors, most of 4which was allegedly secured by third-party mortgage loans, it issued only $675 million in such loans. And, instead of generating the substantial interest promised to investors, the loans generated only around $13.7 million from bona fide third-party borrowers—much less than required to operate Woodbridge's business and pay returns to the investors.

87.    Comerica processed the incoming interest payments and therefore knew that only third-party borrowers were making interest payments to Woodbridge—none of the Shapiro-affiliated entities that had received loans was paying any interest. Further, Comerica knew that the interest payments to Woodbridge it was processing did

CLASS ACTION COMPLAINT

not come close to matching Woodbridge's committed outlays and purported business operations.

88.    A forensic accountant retained by the SEC examined Woodbridge's bank account records and concluded that the transactional activity in Woodbridge's Comerica accounts was not consistent with its purported business model.[5]

89.    In particular, the forensic analysis showed that as early as the third quarter of 2012, and continuing through September 2017, Woodbridge did not generate sufficient income and continuously ran at a cash-flow deficit, which by September 2017 had ballooned to $250 million.[6]  Comerica was aware of Woodbridge's long-term lack of profitability, and, as depositary for all of Woodbridge's revenues, Comerica saw that Woodbridge's real-estate business had no meaningful source of incoming cash apart from investor funds. Woodbridge's ongoing unprofitability, coupled with the banking activity described above, which Comerica observed, constituted a red flag.

90.    Additionally, although Woodbridge was a billion-dollar enterprise, Shapiro was the sole signatory for all Woodbridge bank accounts. And he insisted on hand-signing each and every check, whether to investors, sales agents, or others. These arrangements were highly unusual. An investment concern of Woodbridge's size normally employs a management structure with multiple executives and account signatories.

91.    Shapiro disbursed investor monies out of Woodbridge's Comerica accounts for such suspicious expenditures as $1.4 million on luxury retail purchases at stores like Chanel and Louis Vuitton, $1.6 million on home furnishings, $1.2 million in alimony to his ex-wife, $340,000 on luxury cars, and $400,000 on jewelry.

92.    Shapiro's self-dealing extended to his family as well. His wife and her company Schwartz Media received substantial investor proceeds from Woodbridge's

---

[5] Declaration of Soneet R. Kapila, ¶¶ 76-78, *SEC v. Shapiro*, No. 1:17-cv-24624-MGC (S.D. Fla.), ECF No. 36-2.

[6] *Id.* ¶¶ 86-88.

CLASS ACTION COMPLAINT

Comerica accounts.

93.    Woodbridge's bookkeeping system also was at odds with its large-scale fundraising activities. Instead of retaining external auditors, Woodbridge relied on a controller in a satellite office who was not even a certified public accountant.

94.    In spite of these signs of an illicit enterprise and the mounting orders against Woodbridge, Comerica failed to report the fraudulent conduct or otherwise respond to the red flags connected with the Woodbridge accounts. It continued to accept deposits of Woodbridge investor money, carrying out the transfers needed to consummate the fraud.

## VI.    AGENCY, ALTER EGO, AND CO-CONSPIRATOR ALLEGATIONS

95.    At all relevant times, Defendant and each Doe Defendant and /or Relevant Non-Party was a participant, principal, agent, alter ego, joint venturer, partner, or affiliate of Defendant and each of the other Relevant Non-Parties, and in doing the acts alleged herein, was acting within the course and scope of that participation, principal, agent, alter ego, joint venture, partnership, or affiliate relationship. Defendant and each Doe/Relevant Non-Party had actual knowledge of the wrongful acts of Defendant and each of the other Doe/Relevant Non-Parties: participated in, ratified, approved, joined in, acquiesced, or authorized the wrongful acts of Defendant and each of the other Doe/Relevant Non-Parties; and retained the benefits of those wrongful acts.

96.    Defendant and each Doe/Relevant Non-Party aided and abetted, encouraged, and rendered substantial assistance to Defendant and each of the other Doe/Relevant Non-Parties in perpetrating their fraudulent scheme on Plaintiffs and the class. In taking action, as alleged herein, to aid, abet, encourage, and substantially assist the commissions of the wrongful acts and other misconduct set forth herein, Defendant and each Doe/Relevant Non-Party acted with an awareness of its primary wrongdoing and realized that its conduct would substantially aid the accomplishment of the wrongful acts and purposes set forth herein.

## VII.    TOLLING OF THE STATUTES OF LIMITATIONS

97.     Comerica, aware of the illegal Woodbridge scheme and its injurious effects, fraudulently concealed the scheme by failing to report it while continuing to execute the account transactions that were its lifeblood.

98.     Comerica, Woodbridge, and Shapiro fraudulently concealed from Plaintiffs and class members that the overwhelming majority of FPCMs and Fund Offerings were not secured by loans to holders of commercial real estate, that returns on FPCMs and Fund Offerings would be paid from similar investments, and only on condition that those future transactions occur, rather than from interest payments on the sham third-party loans described in the offering materials, that Shapiro was embezzling millions of dollars in investor funds for his own personal use and enjoyment, that Woodbridge and Shapiro had unlawfully failed to register the FPCMs and Fund Offerings with government regulators, and that Woodbridge and Shapiro had entered into several consent decrees with governmental regulators requiring them to stop violating the law.

99.     Comerica, Woodbridge, and Shapiro were aware that Plaintiffs and class members did not know about the Woodbridge investment fraud. Comerica, Woodbridge, and Shapiro had superior and exclusive knowledge of that fraud. Despite reasonable diligence on their part, Plaintiffs and class members were kept ignorant by Comerica, Woodbridge, and Shapiro of the factual bases for these claims for relief.

100.    The FPCM and Fund Offering sales materials contained misstatements designed to entice Plaintiffs and class members to purchase "safe" and "secured" investments with returns generated by third-party borrowers' interest payments. These fraudulent misrepresentations had the effect of concealing that Woodbridge was, in fact, using primarily new investor funds to fund existing investors' returns.

101.    Plaintiffs and class members reasonably relied to their detriment on Comerica, Woodbridge, and Shapiro's fraudulent concealment of their violations. As a result of this concealment, Plaintiffs and class members did not believe that it was necessary to file a lawsuit.

CLASS ACTION COMPLAINT

102.   Plaintiffs and class members did not discover, and exercising reasonable diligence could not have discovered, the facts establishing Comerica's violations or the harm caused thereby until the Woodbridge entities declared bankruptcy and the SEC filed its enforcement action in December 2017. Plaintiffs learned of the relevant actions of Comerica, Woodbridge, and Shapiro through the bankruptcy and SEC actions and their coverage in the press. Only then did Plaintiffs retain counsel to vindicate their rights. Because Plaintiffs could not have reasonably discovered the facts constituting Comerica's violations until December 2017, all applicable statutes of limitation were tolled until then.

## VIII. CLASS ACTION ALLEGATIONS

103.   Plaintiffs bring this suit as a class action on behalf of themselves and all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), on behalf of a class of all persons who invested in Woodbridge FPCM promissory notes or Woodbridge units.

104.  Excluded from the class are Defendants, their parents, affiliates, subsidiaries, agents, legal representatives, predecessors, successors, assigns, employees, any entity in which Defendants have a controlling interest or which has a controlling interest in any Defendant, and the Doe/Relevant Non-Parties listed above.

105.   Numerosity. The class members are too numerous to be practicably joined. The class members are identifiable from information and records in the possession, custody, or control of Defendant or the Doe/Relevant Non-Parties. Notice of this action can be provided to all members of the class, and the disposition of their claims in a single action will provide substantial benefits to all parties and to the Court.

106.   Typicality. Plaintiffs' claims are typical of the claims of other members of the class. Plaintiffs and each class member invested in Woodbridge investments at issue and were subject to the wrongful conduct alleged in this complaint.

107.   Adequacy of Representation. Plaintiffs are members of the class and will fairly and adequately represent and protect its interests. Plaintiffs have no interests

contrary to or in conflict with the interests of the other class members.

108.   Plaintiffs' counsel are competent and experienced in class action and investor fraud litigation and will pursue this action vigorously.

109.   <u>Commonality and Predominance</u>. Common questions of fact and law exist as to all members of the class and predominate over any questions pertaining to individual class members. Among the questions common to the class are:

Whether Shapiro and Woodbridge committed fraud and/or breached duties to Plaintiffs and members of the class;

Whether Comerica or the Doe/Relevant Non-Parties aided and abetted, joined, and/or participated in Shapiro's and Woodbridge's fraud and/or breach of duties;

Whether Comerica or the Doe/Relevant Non-Parties knowingly disregarded atypical banking activity and other red flags that Shapiro and Woodbridge were committing investor fraud, breaching fiduciary duties, and/or misappropriating investor funds;

Whether Comerica's continued banking support for Shapiro and Woodbridge's violations, to the detriment of Plaintiffs and members of the class, constitutes negligence;

Whether Comerica's or the Doe/Relevant Non-Parties conduct alleged herein violates the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.; and

Whether, in view of their investment losses, Plaintiffs and class members are entitled to damages or restitution.

110.   <u>Superiority</u>. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Although each class member paid at least thousands to dollars to invest in the relevant Woodbridge investments, the cost of litigation will be high. The factual issues in this case are complex and detailed, extend over several years, and relate to many transactions. Absent a class action, most members of the class would likely find the cost of litigating their claims individually to be

25

CLASS ACTION COMPLAINT

1    prohibitively high and would have no effective remedy.

2        111.  Class treatment of common questions of law and fact is a superior method

3    to piecemeal litigation because class treatment will conserve the resources of the courts

4    and will promote efficiency of adjudication. Class treatment will avoid the substantial

5    risk of inconsistent factual and legal determinations of the issues in this lawsuit.

6    **IX.    CLAIMS FOR RELIEF**

7    <u>**COUNT 1**</u>

8    **Aiding and Abetting Fraud**

9        112.  Plaintiffs incorporate the foregoing allegations by reference.

10       113.  As set forth more fully above, Shapiro and Woodbridge perpetrated fraud

11   on the investing public through a series of materially false and misleading statements

12   and omissions. Among other fraudulent conduct, Shapiro and Woodbridge (i)

13   misrepresented the security of the FPCM and Fund Offering investments; (ii)

14   represented that these investments would fund loans to bona fide third parties, when the

15   vast majority of the purported third-party borrowers were LLCs owned and controlled

16   by Shapiro that lacked an income source and never made loan payments; (iii) failed to

17   disclose to investors that they issued only $675 million of the $1.22 billion raised in

18   loans; (iv) concealed from investors that they were operating a Ponzi scheme by, among

19   other unlawful acts, commingling investor funds and paying earlier investors with funds

20   obtained from later investors; and (v) concealed from investors that Shapiro

21   misappropriated and misused millions of investor funds for improper purposes, like

22   financing personal luxuries.

23       114.  Plaintiff and class members reasonably relied to their detriment upon

24   Shapiro and Woodbridge's fraud when they purchased the relevant securities.

25       115.  Comerica and/or the Doe/Relevant Non-Parties knowingly and

26   substantially assisted Shapiro and Woodbridge in unlawfully defrauding Plaintiff and

27   the class, in at least the following respects:

28

a.    Accepting for deposit funds derived from the sale of unregistered securities;

b.    Commingling investments from Woodbridge promissory note holders and purchasers of fund offering units;

c.    Executing and condoning atypical banking procedures to service Shapiro's complex series of accounts, such as accommodating Shapiro's insistence that he hand-sign every check to investors and sales agents;

d.    Carrying out improper and atypical financial transactions such as the transfer of approximately $1.66 billion via nearly 11,000 account transactions;

e.    Continuing to service Woodbridge accounts after five state regulatory agencies determined that Shapiro was engaged in unlawful conduct and served him with cease-and-desist or consent orders;

f.    Failing to identify, monitor, or exercise due diligence related to the regulatory and compliance "red flags" identified herein;

g.    Failing to implement and adhere to compliance and monitoring protocols concerning the use of Plaintiffs and class members' investment funds;

h.    Failing to identify, monitor, or exercise required due diligence in relation to the existence or nonexistence of bona fide third-party borrowers; and

i.    Failing to prevent, report, or otherwise take corrective action in response to Shapiro's misappropriation and misuse of investor funds.

116.    In connection with providing substantial and material assistance to Shapiro and Woodbridge, Comerica was aware of its role in the Woodbridge Ponzi scheme and acted knowingly in assisting Shapiro and Woodbridge.

117.    Comerica and the Doe/Relevant Non-Parties substantially benefited from their participation in the Woodbridge Ponzi scheme. The scheme caused Comerica to earn income from fees and from investing capital derived from Woodbridge investors.

118.    As a direct and proximate result of Defendants' aiding and abetting of fraud, Plaintiffs and class members have been damaged in an amount to be determined

CLASS ACTION COMPLAINT

1  at trial.

2  ## COUNT 2

3  ### Aiding and Abetting Breach of Fiduciary Duty

4  119.   Plaintiffs incorporate the foregoing allegations by reference.

5  120.   At all relevant times, Shapiro was the CEO of Woodbridge and the trustee
6  of the RS Protection Trust.

7  121.   At all relevant times, Shapiro maintained complete or substantially
8  complete control over the Woodbridge Group of Companies and each of the
9  Woodbridge investment funds. Shapiro had complete control, and was the sole
10  signatory for, the Comerica bank accounts in which investor funds were deposited.
11  Shapiro also wrote investors personally, characterizing collateral as "senior" and
12  promising them satisfactory returns.

13  122.   By reason of his controlling positions, actions, and direct and indirect
14  representations to Plaintiffs and class members, Shapiro owed them fiduciary duties of
15  loyalty, care, and to deal honestly and in good faith. By selling Plaintiffs and class
16  members promissory notes and fund offerings pursuant to false offering materials, and
17  by misappropriating, commingling, and otherwise misusing investor funds, Shapiro
18  breached fiduciary duties he owed to Plaintiffs and class members.

19  123.   Comerica and the Doe/Relevant Non-Parties substantially assisted in
20  Shapiro's breaches of fiduciary duty with knowledge that Shapiro was breaching those
21  duties.

22  124.   As a direct and proximate result of Defendants' aiding and abetting of
23  breach of fiduciary duty, Plaintiffs and class members have been damaged in an amount
24  to be determined at trial.

25  ## COUNT 3

26  ### Negligence

27  125.   Plaintiffs incorporate the foregoing allegations by reference.

28  126.   Shapiro and Woodbridge deposited customer funds from Plaintiffs and

### CLASS ACTION COMPLAINT

class members into Comerica bank accounts.

127.    Comerica and the Doe/Relevant Non-Parties knew or should have known that funds raised from Woodbridge investors constituted investor funds. Comerica knew or should have known that it was subject to various common law and regulatory requirements related to monitoring accounts at Comerica, including regulations issued to prevent money laundering and other illicit behavior.

128.    Comerica and the Doe/Relevant Non-Parties owed a duty to Plaintiffs and class members to take reasonable care with regard to the maintenance and use of investor funds on deposit at Comerica. As set forth more fully above, Defendants breached their duty of care by, among other things:

a.    Failing to employ reasonable care in connection with the maintenance and use of Woodbridge investor funds;

b.    ailing to identify, monitor, or exercise requisite due diligence related to the discrepancies and inconsistencies that characterized Shapiro and Woodbridge's deposits and outlays of investor funds;

c.    Failing to implement and adhere to compliance and monitoring protocols concerning Shapiro and Woodbridge's maintenance and use of investor funds;

d.    Failing to identify, monitor, or exercise requisite due diligence related to the regulatory and compliance "red flags" detailed herein, including after the issuance and publication of several state cease-and-desist and consent orders;

e.    Failing to prevent or take any appropriate action in response to Shapiro and Woodbridge's use of funds from new investors to pay sums owed to earlier investors;

f.    Failing to prevent or take any appropriate action in response to Shapiro's embezzlement of investor funds for personal luxuries;

g.    Causing and allowing investor funds to be misappropriated and misused; and

h.      Failing to notify investors or any governmental entity or regulator of Shapiro and Woodbridge's misappropriation and misuse of investor funds.

129.   The breaches described above constitute negligence amounting to bad faith.

130.   Comerica's breaches of its duty of care to Plaintiffs and class members caused them reasonably foreseeable harm.

131.   The policy of preventing future harm strongly disfavors application of the economic loss rule, particularly given the moral blame attached to abetting investment fraud. Plaintiffs and class members did not enter into contracts with Comerica and, thus, seek recovery in tort. There is a high degree of certainty that Plaintiffs and class members suffered injuries, and those injuries were highly foreseeable to Comerica. The transactions associated with Woodbridge's Comerica accounts were intended to, and did, directly affect the investors who had been promised returns and delivery of principal.

132.   As a direct and proximate result of Defendants' negligence, Plaintiffs and class members have lost all or most of the money they paid to Shapiro and Woodbridge, have been denied the use of their assets since making those investments, and have been damaged thereby in an amount to be determined at trial.

## COUNT 4

### Violations of the Unfair Competition Law

### Cal. Bus. & Prof. Code § 17200 *et seq*. ("UCL")

133.   Plaintiffs incorporate the foregoing allegations by reference.

134.   The UCL forbids any unlawful, unfair, or fraudulent business act or practice.

135.   Comerica's and the Doe/Relevant Non-Parties conduct is unlawful, and violative of the UCL, because it violates the common laws of aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and negligence. Additionally, Comerica's conduct is unlawful because Comerica failed to comply with relevant Bank Secrecy Act

30

and anti-money laundering regulations, including those requiring development and implementation of a program to ensure adequate due diligence of banking customers and their account activity.

136.   Comerica's and the Doe/Relevant Non-Parties conduct also is unfair in violation of the UCL by reason of its immoral, unethical, oppressive, unscrupulous, and substantially injurious actions and inaction, including:

a.   Failing to take corrective action after issuance and publication of the state cease-and-desist and consent orders recognizing Woodbridge's violations, including of laws that prohibit defrauding investors;

Failing to take corrective action in response to the panoply of other irregular banking activities detailed above;

Knowingly allowing Shapiro to misappropriate and misuse investor funds; and

Failing to implement and adhere to mandatory Bank Secrecy Act and anti-money laundering protocols.

137.   The gravity of the harm resulting from Defendants' unfair conduct outweighs any potential utility of the conduct. Defendants' failure to take appropriate and necessary steps to protect investors, even in the face of several cease-and-desist and consent orders, harms the public at large and forms part of a common and uniform course of wrongful conduct. There are reasonably available alternatives that would have furthered Defendants' business interests, such as immediately reporting the suspicious account transactions and other atypical activities associated with Woodbridge's Comerica accounts

138.   The harm from Comerica's and the Doe/Relevant Non-Parties unfair conduct was not reasonably avoidable by investors.

139.   Plaintiffs and the class suffered injury in fact, and lost money or property, as a direct and proximate result of Comerica's and the Doe/Relevant Non-Parties unlawful and unfair conduct. Plaintiffs accordingly seek restitution as provided for

31

CLASS ACTION COMPLAINT

under Cal. Bus. & Prof. Code § 17203, in addition to reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment:

A.    certifying this action for class treatment, appointing Plaintiffs as class representatives, and appointing Plaintiffs' counsel as class counsel;

B.    awarding damages or restitution, including pre-judgment interest, on each Count in an amount to be determined at trial;

C.    Granting injunctive or other equitable relief;

D.    awarding reasonable attorneys' fees and costs of litigation; and,

E.    granting such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial for any counts for which a trial by jury is permitted by law.


Dated: February 16, 2018                    Respectfully submitted,

                                            */s/ Jeff S. Westerman*

                                            Jeff S. Westerman
                                            **WESTERMAN LAW CORP.**
                                            1875 Century Park East, Suite 2200
                                            Los Angeles, Ca, 90067
                                            (310) 698-698-7880
                                            jwesterman@jswlegal.com


                                            Steven J. Toll
                                            Times Wang
                                            **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                            1100 New York Ave. NW, Fifth Floor
                                            Washington, DC 20005
                                            (202) 408-4600
                                            stoll@cohenmilstein.com
                                            twang@cohenmilstein.com

                                            *Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT